**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case Nos. 20-CR-128 (TSC)** |
| **v.** | : | **21-CR-390 (TSC)** |
| | : | |
| **KENNETH PATRICK GAUGHAN,** | : | |
| *also known as Richard Strauski,* | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through the undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing for Kenneth Patrick Gaughan, also known as Richard Strauski (hereinafter "the defendant," "Defendant Gaughan," or "Gaughan").   As described herein, the defendant is facing sentencing for two fraud schemes.   He first stole at least $438,200.99 from his former employer, the Archdiocese of Washington ("ADW"), over more than seven years.   To do this, he caused ADW to make payments to three companies he owned for services that were not provided as represented.   After facing charges for that scheme in the United States District Court for the District of Maryland, he committed the deplorable crime of seeking to exploit a once-in-a-century global health crisis for his own greed.   The defendant filed at least 21 [1] fraudulent applications for Paycheck Protection Program ("PPP") loans and Economic Injury Disaster Loan ("EIDL") funds, resulting in the theft of $2,182,465 from these two critical federal programs designed to address the worst economic impacts of the COVID-19 pandemic.   The defendant laundered the proceeds of his fraud and spent the stolen funds for his personal use, including

---

[1] The defendant filed a total of 12 PPP and 12 EIDL applications, but the government did not include 3 of the PPP applications in the loss calculations.   Those three were excluded because one application was a duplicate created by the lender, and the remaining two were applications on behalf of the same entities that were submitted to multiple lenders, arguably consistent with SBA guidance.

buying a house, yacht, and paying off a car note.  His frauds showed a shocking level of greed and disregard for the purpose of these funds, allocated for the most vulnerable Americans and to ameliorate the devastating economic impacts of the COVID-19 pandemic, as well as for his previous employer.

The defendant pleaded guilty on March 2, 2022, to three counts.  One count pertained to the Archdiocese of Washington scheme: Wire Fraud, in violation of 18 U.S.C. § 1343 (Count Eight in the indictment in 20-cr-128).  Two counts pertained to the PPP and EIDL scheme: one count of Wire Fraud, in violation of 18 U.S.C. § 1343, and one count of Money Laundering, in violation of 18 U.S.C. § 1957 (Counts One and Eleven, respectively, in the indictment in 21-cr-390).  By plea agreement, the parties agreed that the final offense level is 28, resulting in a guidelines range of 78 to 97 months' imprisonment.  Plea Agreement at ¶ 4(A)-(C).  The United States Probation Office disagreed with the parties' calculation of the base offense level and applied an additional enhancement for involving conduct described in 18 U.S.C. § 1040, leading to a calculated offense level of 29 and advisory guidelines range of 87 to 108 months' imprisonment.  PSR ¶ 163.  As part of the plea agreement, the government agreed to cap its allocution at the bottom of the Sentencing Guidelines range as calculated by the Court at the time of sentencing.  Plea Agreement at ¶ 5.  Based on the foregoing, and assuming the Court accepts the parties' Guidelines calculations, the government respectfully requests that the Court sentence the Defendant to a sentence of 78 months' incarceration, three years of supervised release, restitution in the amount of $2,677,458.79, and orders of forfeiture.

## I.    THE DEFENDANT'S ARCHDIOCESE OF WASHINGTON FRAUD SCHEME

The Archdiocese of Washington is a religious organization that covers the District of

Columbia and parts of Maryland.   According to ADW's victim impact statement, during the period of the defendant's employment, ADW served approximately 655,000 area Catholics and operated over 60 schools and early learning centers that educated more than 27,000 children. ADW also provided counseling, shelter, adoption and foster care, health care, immigration and legal aid, and affordable housing to its parishioners.

The defendant started working for ADW in 2008 as its Director of Counseling.   Statement of Offense at ¶ 2.   In July of 2013, he was promoted to be an Assistant Superintendent, a position he held until he formally resigned in May of 2018.   *Id.*   In that capacity, the defendant was responsible for recruiting and acting as the point of contact for ADW's contractors, particularly those that instituted anti-bullying and crisis intervention programs.   *Id.*   The defendant was entrusted with obtaining invoices for services from vendors and providing invoices and supporting documentation regarding requests for payments to his superiors at ADW.   *Id.* at ¶ 3.   The defendant had to acknowledge to ADW in 2012 and 2018 that he agreed to ADW's employment policies, which prohibited employees from spending funds of ADW and its schools for personal gain without disclosing that interest in writing to ADW.   *Id.* at ¶ 4.   Nevertheless, from at least June 2010 through April 2018, the defendant devised and executed a scheme to defraud ADW using three companies that he owned and controlled: (1) Soulutions Counseling for Youth, which Gaughan presented in approximately 2010 as a vendor for anti-bullying, crisis intervention, and professional development programs; (2) Company 1, which Gaughan presented in approximately June of 2011 as a vendor for anti-bullying and crisis counseling programs; and (3) Company 2, which Gaughan deceptively claimed in April of 2018 was the provider of a mass text messaging

service[2] used by ADW.[3]   *Id.* at ¶¶ 5, 7, 11, 15.

Without disclosing his ownership and control of these entities as was required by ADW, the defendant presented the companies as vendors to provide services to ADW in areas including anti-bullying, crisis intervention and counseling, professional development programs, and mass messaging service.   *Id.* at ¶¶ 6, 7, 15.   Specifically, the defendant arranged for ADW officials to pay his three companies for services that were not provided as represented.   *Id.* at ¶¶ 10, 13, 15. ADW issued checks to the defendant's companies after he submitted false invoices, failed to disclose his ownership and control of the companies, and represented that the companies provided services that he knew the companies did not provide as represented.   *Id.*   The defendant then deposited these checks into bank accounts he controlled.   *Id.* at ¶¶ 10, 13, 17.   In the case of Company 2, ADW had an ongoing contract with another company to provide the mass messaging service Company 2 purported to provide.   *Id.* at ¶ 16.

The defendant engaged in this scheme for almost eight years, between at least in or about June of 2010 through in or about April of 2018.   *Id.* at ¶ 5.   In the course of doing so, he used the alias Richard Strauski – going so far as to alter his otherwise real driver's license to reflect the alias name – and virtual mailboxes, including at 1030 15th Street, Northwest, Suite 170-B1.[4]   *Id.* at ¶ 15.   The defendant took steps to create the illusion that his three companies were legitimate

---

[2] The mass text messages could, for instance, relay information related to a blizzard, flood, or active shooter.

[3] The names of Company 1 and Company 2 have not been included in the public filings because Company 1 bears the name of a real company and Company 2 bears the same name of a real messaging service.

[4] As described below, Gaughan also used this UPS virtual mailbox in the PPP/EIDL scheme.

and that he was unaffiliated with those companies, including creating elaborate email conversations between himself, his alias Strauski, and other ADW employees.   ADW sustained an actual loss amount of at least \$438,200.99 from the defendant's scheme.[5]  *Id.* at ¶ 49.   The defendant spent the fraud proceeds on personal expenditures, including gambling, entertainment, his mortgage, and a boat.

## II.      THE DEFENDANT'S PPP AND EIDL FRAUD SCHEME

### a.  Background of the PPP and EIDL programs

In March 2020, the CARES Act authorized billions in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").   Qualifying businesses with certain payroll expenses could obtain forgivable PPP loans to be used by the business for permissible expenses: payroll costs, interest on mortgages, rent, and utilities.   Later legislation permitted borrowers to take a "second draw" PPP loan under the same general terms.   Allowable expenses were expanded to include worker protection costs related to COVID-19, uninsured property damage costs caused by looting or vandalism during 2020, and certain supplier costs and expenses for operations.

An Economic Injury Disaster Loan ("EIDL") is an SBA-administered loan designed to assist small businesses that suffered substantial economic injury as a result of a declared disaster. The EIDL application process collected information concerning the business and the business

---

[5] This is the amount the government is asking for in restitution for the ADW scheme.   The victim impact statement submitted by ADW requests a slightly higher amount of \$450,522.95.   It is undersigned counsel's understanding that ADW's higher calculation reflects the total amount of checks written to Gaughan's companies that they consider loss.   In the course of plea negotiations, the defense asked for some payments for certain expenditures to be removed from the restitution calculation, which the government agreed to do.   The parties' final calculation was \$438,200.99 as reflected in the plea agreement.

owner, including information as to the gross revenues for the 12 months prior to the disaster; the cost of goods sold; and information as to any criminal history of the business owner.

Both programs are described in detail in the Statement of Offense at ¶¶ 25-29.

### b.   The Fraud Scheme

Beginning no later than March 2020 and continuing through at least August 2020, the defendant engaged in a scheme to fraudulently obtain funds by submitting applications to PPP lenders and to the SBA for EIDL funds.   *Id.* at ¶ 31.   The defendant requested these funds for 12 companies that purported to provide services relating to service and emotional support animals: Therapetic Solutions; Therapy Dog International; Service Animals of America; ESA Registry International; Certapet Inc; Therapy Dog Inc; Service Dog of America; Therapy Pet Inc; Official Service Dogs; Anything Pawsable Inc; International Service Animals; and US Therapy Dog.   *Id.* at ¶ 20.   To the extent these entities existed at all, they were controlled by the defendant.   *Id.* at ¶ 21.

From at least April through July of 2020, the defendant electronically submitted at least 12 PPP applications on behalf of these claimed service and emotional support animal companies to various participating PPP lenders.   *Id.* at ¶ 12.   The applications were riddled with falsities, including listing the same nonexistent 25 employees across companies, the same UPS mailbox as the business addresses, and fabricated payroll expense amounts.   *See id.* at ¶¶ 34-35, 42.   The defendant also submitted falsified supporting documentation, including falsified federal tax forms, fabricated payroll documentation, and altered bank records.   *Id.* at ¶ 35.   Several applications listed identical wage amounts, with a total monthly pay of $144,817.27, employer taxes of $14,570.99, and total payroll costs of $159,388.26.   Additionally, 7 of the 12 PPP applications

were submitted in the name of Person 1 – who was a friend and former roommate of the defendant's – without Person 1's knowledge or permission. *See id.* at ¶ 33. This involved using Person 1's social security number, electronic signature, and electronic initials, as well as providing copies of Person 1's passport and driver's license to the lenders.[6] Several of the defendant's PPP applications were approved, and the funds were deposited into two bank accounts belonging to the defendant. *Id.* at ¶ 36. One account was in the name of Therapetic Solutions; the other was in the name of Therapy Dog International, with Person 1 as the listed owner despite the account being fully controlled by Gaughan.[7] *Id.* at ¶¶ 23, 36.

On March 30, 2020, over less than a one-hour period, the defendant submitted at least 12 EIDL applications on behalf of the same above-listed service and emotional support animal companies. *See id.* at ¶ 37. These applications were submitted in his own name and contained falsities similar to the PPP applications, such as listing the same number of employees and similar average monthly payroll amounts across different companies. *See id.* at ¶¶ 37, 42. For every entity for which he applied for a PPP or EIDL, the defendant used some variation of the same business address: 1030 15th Street, NW, Suite 170-B1, Washington, DC; as stated above, this is a

---

[6] The applications also used an email address with Person 1's full legal name, which the defendant set up and used to communicate at least one bank pretending to be Person 1.

[7] Person 1 submitted a declaration of victim losses letter filed by the United States Probation Office, which requests restitution in the amount of $1,270.00 for reimbursement for therapy sessions. This has been added to the amount of restitution requested by the government. In June 2022, Person 1 indicated that Person 1 did not plan to submit any other victim impact statement. As the Court may recall, Person 1 had previously asked government counsel to submit a letter dated February 17, 2022 to the Court in advance of the plea hearing. The Court acknowledged the letter at the plea hearing and stated that it would be treated as a victim impact statement. Undersigned counsel will bring the letter to the sentencing in case the Court would like another copy.

private mailbox at a UPS Store.   As a result of the fraudulent EIDL applications, the defendant received one advance of EIDL funds by the SBA.   *Id.* at ¶ 39.

### a.   Total Actual Loss

The defendant's fraudulent applications resulted in the actual loss of $2,182,465, comprised of seven fraudulent PPP loans totaling $2,179,465 and one fraudulent $3,000 advance on EIDL funds.

| DEPOSIT DATE | TYPE | NAME | LENDER | AMOUNT |
|---|---|---|---|---|
| 4/14/20 | EIDL | Therapetic Solutions Inc | SBA | $3,000.00 |
| 5/4/20 | PPP | Therapetic Solutions | Bank of America | $307,342.00 |
| 5/4/20 | PPP | Therapy Dog International | Bank of America | $307,343.00 |
| 5/4/20 | PPP | Service Animals of America | Fund-Ex Solutions Group LLP | $303,000.00 |
| 5/11/20 | PPP | Therapy Dog Incorporated | Kabbage, Inc. | $277,432.00 |
| 5/13/20 | PPP | ESA Registry International | First Bank of the Lake | $378,310.00 |
| 5/26/20 | PPP | Certapet Inc | Radius Bank | $303,038.00 |
| 6/19/20 | PPP | Official Service Dogs | Northeast Bank | $303,000.00 |
| | | | | **$2,182,465.00** |

### b.   Total Intended Loss

In total, the Defendant attempted to steal at least $2,788,503 in PPP and EIDL loans. Statement of Offense at ¶ 49.   This calculation adds two PPP loan applications, listed below, that were not funded.   The SBA determines the amount of loan proceeds for each EIDL application, so the intended loss amount of the defendant's EIDL attempts is undeterminable and those applications are not listed below.

| SUBMISSION DATE | TYPE | NAME | LENDER | AMOUNT |
|---|---|---|---|---|
| 4/12/20 | PPP | Service Dog of America | Celtic Bank Corporation | $303,038.00 |
| 5/20/20 | PPP | Therapy Pet Inc | Fund-Ex Solutions Group, LLC | $303,000.00 |
| | | | | $606,038.00 + $2,182,465.00 (actual loss from above) **$2,788,503.00** |

### c.  Disposition and Laundering of the Proceeds

After successfully stealing $2,182,465 in PPP and EIDL funds, the defendant spent the fraud proceeds for personal benefit.  This included buying a house in Northeast, DC using a $1,130,000 cashier's check.   Statement of Offense at ¶¶ 39, 46.   A photograph is below.



*DC residence purchased with fraud proceeds*

It also included buying a 2020 Cruisers yacht for almost $300,000 and paying off a 2020 Kia Stinger car note for $45,975.   The defendant also transferred over $100,000 to a personal

Robinhood investment account, satisfied a $83,000 civil judgment against him,[8] made personal credit card payments, and made student loan payments of over $40,000. *See id.* at ¶¶ 41, 45. Additional funds could be traced to Amazon payments and day-to-day living expenses. The defendant conducted at least 11 transactions exceeding $10,000 to launder the fraud proceeds. *Id.* at ¶ 45.

When law enforcement executed a search warrant at the defendant's home on the day of his arrest, they found $50,000 in cash on the defendant's front patio, hidden in a carrying case inside a flower box. *Id.* at ¶ 47.

### III.    PROCEDURAL HISTORY

The defendant was initially prosecuted in United States District Court for the District of Maryland for his ADW fraud scheme.   An indictment was returned on September 24, 2018, and he proceeded to trial in December 2019.   On January 2, 2020, the Maryland district court granted the defendant's motion for judgment of acquittal on venue grounds, on the basis that the checks at issue for the mail fraud counts were not mailed from the State of Maryland – because they were taken by ADW from a mailroom in Hyattsville, Maryland to the Brookland Post Office in the District of Columbia – or delivered in the State of Maryland.   *See* 18-cr-492-PX, ECF No. 70.

After the defendant's Rule 29 motion was granted, the ADW scheme was charged in the District of Columbia.   A twelve-count indictment was returned against the defendant on July 22, 2020.   Specifically, the defendant was charged with five counts of Mail Fraud, in violation of 18 U.S.C. § 1341; six counts of Wire Fraud, in violation of 18 U.S.C. § 1343; and one count of

---

[8]  This related to civil litigation Gaughan was involved in with Certapet LLC for alleged corporate identity theft.

Monetary Transaction of Criminally Derived Property, in violation of 18 U.S.C. § 1957.   The government filed a motion to seal the indictment because it had learned days earlier of the defendant's involvement in the CARES Act scheme and wanted time to seek a criminal complaint in the new investigation to arrest the defendant on both cases simultaneously.   The defendant was arrested in both cases on August 11, 2020.

The parties subsequently engaged in plea negotiations involving both cases.   The parties believed they had reached an agreement in early 2021, but the defendant changed his mind. Accordingly, the government sought to indict the defendant in the CARES Act case.   On June 7, 2021, a grand jury returned an eleven-count indictment charging the defendant with two counts of Wire Fraud, in violation of 18 U.S.C. § 1343; three counts of Bank Fraud, in violation of 18 U.S.C. § 1344; two counts of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1); one count of Theft of Government Property, in violation of 18 U.S.C. § 641; one count of Laundering of Monetary Instruments, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and two counts of Monetary Transaction of Criminally Derived Property, in violation of 18 U.S.C. § 1957.   The defendant changed counsel in May of 2021.   The parties subsequently engaged in further plea negotiations, leading to the instant plea agreement, which was entered on March 2, 2022.

## IV.   SENTENCING GUIDELINES

### a.  The Plea Agreement's Guidelines Calculation

By plea agreement, the parties agreed that the defendant's offense level was 30 and that after application of a two-point reduction for acceptance of responsibility, the Estimated Offense Level would be at least 28, resulting in an estimated Guidelines range of 78 to 97 months' imprisonment.   *See* Plea Agreement at ¶ 4(A)-(C).   Pursuant to U.S.S.G. § 3D1.2, the wire fraud

counts are grouped because the offense level is determined largely on the basis of the total loss. Pursuant to Application Note 6 to U.S.S.G. § 2S1.1, because the defendant will be convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts are grouped pursuant to subsection (c) of §3D1.2 (Groups of Closely-Related Counts).   Specifically, the parties agreed to the following Guidelines calculation:

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(1) | Base Offense Level | 7 |
| U.S.S.G. § 2B1.1(b)(1)(I) | Loss more than $1,500,000 | 16 |
| U.S.S.G. § 2B1.1(b)(10) | Sophisticated Means | 2 |
| U.S.S.G. § 2B1.1(b)(17)(A) | More than $1,00,000 from Financial Institution | 2 |
| U.S.S.G. § 2S1.1(b)(2) | Conviction under 18 U.S.C. § 1957 | 1 |
| U.S.S.G. § 3B1.3 | Abuse of Position of Trust | <u>2</u> |
| | **Offense Level** | **30** |
| | | |
| U.S.S.G. § 3E1.1(a) | Acceptance of responsibility | <u>-2</u> |
| | **Final Offense Level** | **28** |

### b.  Differences

The PSR's offense level calculation differs from the Parties' agreed-upon Guidelines calculation due to (1) the interpretation of the cross reference from U.S.S.G. § 2S1.1 to § 2B1.1(a) to determine the base offense level, and (2) the PSR's imposition of a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(12) for conduct described in 18 U.S.C. § 1040.   *See* PSR ¶ 163. Each issue is addressed in turn.

### i.  Base Offense Level

The government disagrees with the base offense level calculated by the PSR for the grouped counts.   The PSR states that the base offense level should be 6, pursuant to § 2B1.1(a)(2), but the government believes it should be 7, pursuant to § 2B1.1(a)(1).   *See* PSR at ¶ 76.   The PSR

calculation results in a Total Offense Level of 29, with a Guidelines range of 87 to 108 months'
incarceration.   *See* PSR at ¶¶ 70-84 (offense level calculation).

The governing guideline for the grouped counts is § 2S1.1, for money laundering in
violation of 18 U.S.C. § 1957.   To determine the base offense level under § 2S1.1, § 2S1.1(a)(1)
directs the Court to apply the "offense level for the underlying offense from which the laundered
funds were derived," if the defendant is criminally responsible for the underlying offense and that
offense level can be determined.   Here, the underlying offense is wire fraud,[9] for which the
defendant is criminally responsible, and which is governed in turn by § 2B1.1.   At this point,
§ 2B1.1(a)(1) and (a)(2) provide that the base offense level is either 7, if the defendant was
convicted of an offense "referenced to this guideline" (§ 2B1.1) and that offense of conviction has
a statutory maximum term of 20 years or more, or 6, if otherwise.

It is undersigned's understanding that the United States Probation Office has taken the
position that in these circumstances the relevant "offense of conviction," as referenced by § 2B1.1,
is *money laundering*, not wire fraud, and money laundering in violation of 18 U.S.C. § 1957 is not
an "offense referenced to this guideline [§ 2B1.1]."   *See* PSR at 36-37.   Therefore, subsection
(a)(1) does not apply, and the base offense level should be 6 pursuant to subsection (a)(2).   *Id.*

The government respectfully disagrees with the United States Probation Office's
interpretation of § 2B1.1(a)(1) and (a)(2) as they apply to this case.   Instead, the government
believes that the relevant "offense of conviction" should be wire fraud, and that subsection (a)(1)
therefore applies, and the base offense level is 7.   First, this reading makes intuitive and logical

---

[9] Count Eleven of the indictment in 21-cr-390 lists the underlying offenses as both wire fraud and
bank fraud.   Given the plea agreement involves a plea to wire fraud, that is the offense referred to
above.

sense.   The money laundering guideline, § 2S1.1(a)(1), calls for a defendant who is criminally responsible for the underlying offense that generated the proceeds being laundered—such as wire fraud—to be punished as if the defendant were convicted of the underlying offense, by calculating the offense level for the underlying offense and applying it to the defendant.   Then, § 2S1.1 applies certain enhancements for the defendant's *additional* criminal conduct in laundering the proceeds of his criminal activity.   This is appropriate because money laundering offenses are often geared toward facilitating the underlying offense, making it harder to detect, making it more difficult to recover stolen proceeds, and so forth.   Thus, in applying § 2S1.1(a) to calculate the offense level for a defendant who laundered the proceeds of wire fraud, it makes sense to calculate the wire fraud guideline as if the defendant had in fact been convicted of wire fraud.   Because wire fraud in violation of 18 U.S.C. § 1343 is an offense punishable by up to 20 years in prison, and because § 1343 is referenced to § 2B1.1, the base offense level should be 7, pursuant to § 2B1.1(a)(1).[10]

To hold otherwise would lead to illogical results.   The PSR's reading would mean that laundering the proceeds of basic property crimes (calculated under § 2B1.1) is punished more lightly than laundering the proceeds of other crimes, because other guideline provisions do not have the same dual scheme set forth in § 2B1.1(a)(1) and (2).   Here, it also obviates the +1 enhancement for a defendant convicted of a § 1957 offense (per § 2S1.1(b)(2)(A)) predicated on wire fraud, because the defendant also receives -1 discount in calculating the underlying offense level under § 2B1.1—leaving no additional penalty for the laundering conduct.   In other words, a

---

[10] This is precisely what one would also expect under the Guidelines admonition to incorporate all "relevant conduct" in assessing the defendant's offense level, specific offense characteristics, cross references, and adjustments.   *See* U.S.S.G. § 1B1.3(a).

defendant who, as here, pleads guilty to both wire fraud in violation of § 1343 and expenditure money laundering in violation of § 1957 will have the same offense level as if he pleaded guilty solely to wire fraud.   This cannot be what the Sentencing Commission intended.

Second, § 2B1.1(a)(1) applies under its literal terms here because the defendant *was* convicted of an offense referenced to § 2B1.1—namely, Count One in 21-cr-390 and Count Eight in 20-cr-128, both charging Wire Fraud.[11]   Numerous cases have adopted this common-sense understanding.   *Compare United States v. Abdelsalam*, 311 F. App'x 832, 845 (6th Cir. 2009) (applying base offense level 6 where defendant was convicted of money laundering and receipt of stolen property, a 10-year offense); *with United States v. Nikolovski*, 565 F. App'x 397, 401-02 & n.4 (6th Cir. 2014) (clarifying that *Abdelsalam*'s holding that the proper base offense level was six was based on the ten-year statutory maximum penalty for violation of 18 U.S.C. § 2315); *see also United States v. Campbell*, 765 F.3d 1291, 1296 n.3 (11th Cir. 2014) ("Section 2S1.1(a)(1) provides that the base offense level for money laundering is the offense level of the underlying offense that produced the laundered money.   Here, the underlying offense is the wire fraud and mail fraud charges, in violation of 18 U.S.C. §§ 1341 at 1343.   The guideline section associated with those charges is § 2B1.1. Section 2B1.1(a)(1) provided Campbell's base offense level of 7."); *United States v. Salado*, 590 F. App'x 692, 693 (9th Cir. 2015) (applying base offense level 7 where defendant was convicted of § 1957 and also "was convicted of the underlying offenses of

---

[11]   Indeed, §2S1.1(a)(1) instructs that the base offense level be calculated on the hypothetical that the underlying offense is the offense of conviction – if the offense level for that offense can be determined.   If there is no such level because there's no § 2B1.1 "offense of conviction," by the PSR's logic, the base offense level of 8 would apply. §2S1.1(a)(2).   But the clear implication of the analysis in (a)(1) is to proceed under a hypothetical conviction for the underlying offense. This is particularly clear when, as here, defendant's actual offenses of conviction include wire fraud.

mail fraud and bank fraud, each punishable by a statutory maximum term of imprisonment of twenty years or more").  Here, because the defendant was convicted of *both* money laundering *and* wire fraud, § 2B1.1(a)(1) applies, and the base offense level should be 7.

That is the approach recently adopted in this district by Chief Judge Howell in sentencing a defendant convicted of both money laundering and bank fraud offenses:

> THE COURT: 2S1.1(a)(1) instructs that the base offense level for the underlying offense from which the laundered funds were derived, namely the bank fraud, and for which the defendant is convicted in Counts 1 and 2, is determined by 2B1.1. So, in this respect, 2S1.1(a)(1) sends the base offense level for the money laundering directly to 2B1.1.  2B1.1, in turn, provides that the base offense level for the defendant's underlying bank fraud should be 7 if the defendant was convicted of an offense referenced to this guideline and that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; see the guideline at 2B1.1 (a)(1) -- or otherwise should be 6. See 2B1.1(a)(2), defendant's underlying bank fraud for which he was convicted and pleaded guilty to Counts 1 and 2 of the superseding indictment is punishable by up to 30 years' imprisonment. See 18 U.S.C. Section 1344, and is referenced to Section 2B1.1 in Appendix A of the sentencing guidelines.   Thus, as the government contends, the plain text of the guideline dictates that the defendant's base offense level should be 7, not 6.

> Acting on the advice of staff apparently at the sentencing commission, the probation office, and the defense posit that the base offense level should be 6 since money laundering is not an offense referenced to this guideline.   While correct that money laundering is not referenced directly to 2B1.1 -- see Appendix A -- in this case, the defendant was convicted not only of money laundering conspiracy but also of the underlying bank fraud from which the laundered funds were proceeds and, in addition, the 2S1.1 money laundering guideline does refer for the base offense level -- that money laundering offense for a direct launderer -- to 2B1.1.   Thus, base offense level 7, at the guideline at 2B1.1(a), applies.

*United States v. Kelvin Otunyo*, D.D.C. No. 18-cr-251 (BAH), ECF No. 116 (Tr. of 8/13/21 Sentencing Hr'g), at 27:2-28:9.   Judge Bates recently adopted this position in *United States v. Jamar Skeete*, 19-cr-414 (JDB) (April 8, 2022 sentencing hearing); ECF No. 43 (sealed Statement of Reasons).

The government respectfully submits that this approach is persuasive and consistent with the plain meaning of § 2B1.1(a)(1) as applied to this case.

### ii.   Enhancement Under § 2B1.1(b)(12)

The final PSR adds a two-level increase under § 2B1.1(b)(12) for involving conduct described in 18 U.S.C. § 1040.   The government contemplated the application of this enhancement at the time of initial plea discussions in this case and did not believe it should be applied.   That is still the government's position.   Accordingly, the government submits that the Guidelines range calculated by the parties in the plea agreement, 78 to 97 months' incarceration, should be used at sentencing.

### c.   Criminal History and Guidelines Range

The PSR calculated zero criminal history points, resulting in a Criminal History Category of I.   PSR at ¶ 87.   The government does not contest the PSR's criminal history calculation.

A total offense level of 28, as calculated by the parties' plea agreement, and a Criminal History Category of I result in an advisory Guidelines range of 78 to 97 months' imprisonment.

A total offense level of 29, as calculated by the PSR, and a Criminal History Category of I result in an advisory Guidelines range of 87 to 108 months' imprisonment.   PSR at ¶ 158.

## V.   THE 18 U.S.C. § 3553(a) FACTORS

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Sentencing Guidelines are no longer mandatory.   However, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and "should be the starting point and the initial benchmark" in determining a defendant's sentence. *United States v. Gall*, 552 U.S. 38, 46, 49 (2007).

Accordingly, this Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* at 49.

Next, the Court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id*. at 49-50. The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a). *United States v. Rita*, 551 U.S. 338, 347-351 (2007). The § 3553(a) factors include, *inter alia*: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant; (4) the need to avoid unwarranted sentence disparities; and (5) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1)-(7).

### A. The Nature and Circumstances of the Offenses and the Need for the Sentence to Reflect the Seriousness of the Offenses

The defendant's offenses are egregious. The defendant's fraud upon ADW was not an isolated incident. It was not a two-time mistake. Instead, over the course of almost eight years, the defendant decided to steal from ADW repeatedly. As the Director of Counseling and Assistant Superintendent, he abused his position of trust with the organization by arranging services to be purportedly provided by his own illegitimate companies and submitting invoices that ADW paid.

In the CARES Act scheme, the defendant shamelessly looted government programs meant for people who otherwise stood to lose their livelihoods as a result of the COVID-19 pandemic. The defendant executed a vast and sophisticated scheme to rob the PPP and EIDL programs.

18

Using fraudulent documents and tax returns and, in many instances, the identity of Person 1, the defendant created complex false applications for government funds, succeeding at stealing $2,182,465 and attempting to steal even more.   The sheer number of false applications demonstrates that the defendant did not suffer from a momentary lapse in judgment; he instead made the deliberate choice to engage in a relentless pattern of fraud.   The defendant's scheme robbed emergency government relief programs that were intended to save businesses – and their employees – from the unprecedented economic impact of the COVID-19 pandemic.   These funds were finite; in other words, by stealing PPP funds, the defendant prevented other deserving businesses from accessing desperately-needed help.   He did so out of sheer greed and with callous disregard to those who were actually suffering economic impacts from COVID-19.

The gravity of the defendant's offenses and the sophistication of his schemes support a serious term of imprisonment.

**B.**   **The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct**

A significant sentence of imprisonment here is necessary for both specific deterrence and general deterrence.

While the PPP program and COVID EIDL program have ended, it is critical that the defendant's sentence serve as a deterrent to others who would rob government programs. Government program fraud is a deliberate and calculated crime of choice.   It is therefore more susceptible to general deterrence and more in need of a significant sentence to achieve that deterrence.   *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted).   This type of crime is also difficult to detect

19

and highly lucrative.   This defendant received $2,182,465 directly into his bank accounts, making this type of crime extremely attractive for would-be fraudsters, unless there is a significant fear of meaningful consequences.   *See*, *e.g.*, *United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

Of even more importance is the need to deter this specific defendant from committing additional fraud.   The defendant is being sentenced for two schemes: one betraying his employer that offered him a stable career and good salary, and the other a crime spree that included numerous fraudulent applications for government funds.   The PPP/EIDL scheme was committed while the defendant was anticipating prosecution in the District of Columbia for his fraud against ADW. The defendant's prosecution was dismissed in the District of Maryland on January 2, 2020; the defendant submitted his EIDL applications less than three months later, on March 30, 2020. Defendant Gaughan told Person 1 that he perpetrated the PPP/EIDL fraud scheme to protect or take care of Person 1 and Andrew Fisher, whom Person 1 refers to as the defendant's "boyfriend," with the proceeds while he (Gaughan) was incarcerated for the ADW case.   Person 1 also reported that Defendant Gaughan suggested he may have set up offshore accounts in the names of Person 1 and Mr. Fisher where he stashed money for their benefit.[12]

In sum, it is of the utmost importance that this defendant be sentenced to a significant term of incarceration, in order to specifically deter him from his relentless course of fraudulent conduct.

---

[12] The government has no additional information on whether or not any such accounts exist.

C.      The History and Characteristics of the Defendant

The defendant will have recently turned 44 years old at the time of sentencing and has no criminal history prior to the instant schemes.   PSR at 3 and ¶¶ 85-91.   He is extremely educated, obtaining a Bachelor's degree in Psychology in 2001, Master of Arts in Theology in 2007, Master of Science in Psychology in 2007, and Doctorate in Psychology in 2021.   *Id.* at ¶¶ 128-130.   He is a licensed professional counselor and recently worked as an online therapist. *Id.* at ¶¶ 131-132, 135.   He reports being in a common-law marriage with Andrew Fisher.   *Id.* at ¶ 99.[13]   He also reports having had a positive, supportive childhood in Cleveland, Ohio, although his father did abuse alcohol.   *Id.* at ¶¶ 95-98, 102.   The defendant reported that his parents are "amazing" and that his family "is a shining example of 'love, sacrifice, and support.'" *Id.* at ¶ 95.

It is evident that the defendant is an intelligent person able to jump through numerous hoops to complete the frauds he has.   He knew his conduct was illegal and had the ability to earn a substantial salary within the bounds of the law.   Nevertheless, despite knowing the legal and professional risks, the defendant decided to engage in both of these fraud schemes, requiring ongoing efforts.   In the case of the ADW scheme, it spanned years, all while the defendant continued going to work and facing those whom he was defrauding.   When he retained his liberty after that trial, he jumped at the opportunity to defraud the PPP and EIDL programs and

---

[13] The government does not understand Mr. Gaughan and Mr. Fisher to have been married in a ceremony.   It is worth noting that, although the defendant has submitted some paperwork to DC government for food assistance stating he is married, in an application dated May 2, 2022, which was after the date of the PSR interview (*see* PSR at ¶ 92), the defendant listed his marital status as "Single."   Finally, as referenced above, Person 1 refers to Mr. Fisher as the defendant's "boyfriend."

spent the proceeds on excessive personal luxuries.

The PSR notes that "the defendant's numerous documented medical issues" would warrant a variance from the applicable Guidelines range.  PSR at ¶ 192.  The government respectfully disagrees that the defendant's health issues warrant a reduced sentence.  The defendant is not incapacitated by his health from being able to commit future fraud schemes.  The defendant is still able to travel, taking trips to Mexico in February of 2020 and Florida in late April/early May of 2021.   Person 1 also reported meeting up with the defendant in public bars or restaurants during the COVID-19 pandemic.   In short, the defendant's health issues do not seem to restrict him from living a normal life and, accordingly, should not govern his sentence for committing multiple fraud schemes.

The defense also submitted the report of Dr. Richard Ratner.   Even assuming the noted personality and adjustment disorder diagnoses, they do not undo or excuse the defendant's actions.   The defendant is a licensed counselor, recently worked as an online therapist, has achieved the highest level of education in Psychology, and was employed by ADW working with contractors that instituted anti-bullying and crisis intervention programs.   He was as well positioned as anyone to identify problems and seek help, given he had health insurance and was aware of resources in this realm.   Instead, he committed repeated fraud schemes, targeting both an employer and the federal government.

To the extent the defendant's actions are the result of his mental health issues, it demonstrates his greater danger to the community given his repeated, callous fraudulent behavior.   Parts of Dr. Ratner's report demonstrate the defendant's state of mind and risk of future criminal conduct.   The report states that the defendant's actions in the ADW scheme

22

"were systematic, deliberate, and opportunistic based upon his position of trust and financial responsibility," that he is "well aware of the difference between right and wrong and what is and what is not lawful," and that he committed the PPP/EIDL scheme because "if he was going to be prosecuted with the same ferocity a second time, he wanted it to be for something (in his mind) more tangibly and spectacularly illegal than the crimes involved in the ADW scheme." Dr. Ratner report at 7-8.

The defendant's history of engaging in two sweeping fraud schemes so close in time, targeting both his former employer and those suffering from the COVID-19 pandemic, demonstrate that this defendant is a habitual fraudster.   Rather than hesitate to engage in another scheme even after being charged in the District of Maryland, the defendant entered the PPP and EIDL scheme completely undeterred, and perhaps even emboldened, by his prior contact with the criminal justice system.   All of the foregoing supports a significant period of incarceration.

### D.      Unwarranted Sentencing Disparities

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second.").   The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences."   *Id.* at 533.   A sentencing court "necessarily g[ives] significant weight and

consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

## VI.   RESTITUTION AND FORFEITURE

### A.   Restitution

Restitution is mandatory under 18 U.S.C. § 3663A.   *See, e.g., United States v. Dickerson*, 370 F.3d 1330, 1335-36 (11th Cir. 2004) ("The MVRA obligates district courts to order restitution in certain cases, including wire fraud."); *United States v. Polichemi*, 219 F.3d 698, 707, 714 (7th Cir. 2000) ("[T]he court must follow the provisions of the Mandatory Victim Restitution Act of 1996 . . . because Olson was convicted of an offense of property [money laundering under § 1957] as described in § 3663A(c)(1)(A)(ii).").

In his plea agreement, the defendant acknowledged the Court's obligation to determine mandatory restitution and agreed, apart from that determination, to pay restitution in the amount of $2,620,665.99.   Plea Agreement at ¶ 11.   The government requests that the Defendant be ordered to pay restitution in the total amount of $2,677,458.79.   This amount is $56,792.80 higher than the $2,620,665.99 the defendant agreed to pay in the plea agreement.   The higher amount includes additional victim requests made after the entry of the plea that should be awarded as mandatory restitution.   Those additions are reflected in italics below and include the payment of PPP processing fees to the SBA for some of the PPP loans and reimbursement to Person 1 for therapy sessions.   Other adjustments have been made from the plea agreement to reflect that some of the PPP loans have since been purchased by the SBA, so the restitution should now be paid to

SBA rather than the initial lender.[14]   The restitution should be paid as follows:

| Victim | Restitution Amount |
|---|---|
| Archdiocese of Washington (who has been reimbursed by its insurance company, so the restitution should be paid to Catholic Mutual Group) | $438,200.99 |
| Bank of America | $614,685.00 |
| SBA for loan initially made by Fund Ex Solutions | $303,000.00 |
| *SBA for PPP processing fee for above loan ($303,000 to Fund Ex Solutions)* | *$15,150.00* |
| Cross River Bank (initial paperwork listed Kabbage Inc.) | $277,432.00 |
| *SBA for PPP processing fee for above loan ($277,432 to Kabbage Inc.)* | *$13,871.60* |
| SBA for loan initially made by First Bank of the Lake | $378,310.00 |
| *SBA for PPP processing fee for above loan ($378,310 to First Bank of the Lake)* | *$11,349.30* |
| SBA for loan initially made by Radius Bank | $303,038.00 |
| *SBA for PPP processing fee for above loan ($303,038 to Radius Bank)* | *$15,151.90* |
| SBA for loan initially made by Northeast Bank | $303,000.00 |
| SBA for EIDL | $3,000.00 |
| *Person 1* | *$1,270.00* |
| **Total:** | **$2,677,458.79** |

## B.  Forfeiture

As part of his plea agreement, the defendant agreed to the forfeiture of seven specific property items, to include the Kia Stinger, Cruisers Yacht, house in Northeast Washington, DC, and $50,000 cash recovered from his front patio flower box.[15]   The defendant also agreed to the entry of a forfeiture money judgment in each case: $438,200.99 in 20-cr-128 (ADW scheme), and

---

[14] Undersigned counsel has also since been made aware that interest applies for restitution on PPP loans.   Interest is not included in the restitution request here because the calculations government counsel currently has have been calculated to the present rather than the date charges were brought against the defendant.

[15] The other specific property items listed in the forfeiture order are $66,501.91 in United States currency seized from Bank of America account belonging to the defendant; $20,170.20 in United States currency seized from another Bank of America account belonging to the defendant; and $106,844.27 in United States currency seized from the defendant's Robinhood Markets, Inc. account.

$2,182,465 in 21-cr-390 (PPP and EIDL scheme).   *See* Plea Agreement at ¶ 12.

Consent orders of forfeiture were presented at the time of the plea in both cases.   The dockets reflect the Court signed both Orders on the date of the plea hearing, March 2, 2022, although the scanned documents on the docket do not include the Court's signature page.   *See* 20-cr-128 ECF No. 41; 21-cr-390 ECF No. 59.

## VII.   SPECIAL CONDITIONS OF THE SENTENCE AND SUPERVISED RELEASE

The government agrees with the special conditions proposed by the United States Probation Office in the PSR.   *See* PSR at ¶¶ 173-175.   This includes a restitution obligation, financial disclosure, financial restrictions, employment restrictions, substance abuse testing, gambling restriction, and the Bureau of Prisons Drug Abuse Education Program.   *Id.*   The government also requests that the defendant receive a mental health assessment and any necessary treatment, such as counseling.   *See id.* at ¶ 121.

## VIII.   CONCLUSION

The Defendant is appearing to be sentenced for his unrelenting fraudulent conduct in two schemes.   One involved defrauding his employer, and the other targeted critical government programs of funds ear-marked for the people and businesses suffering devastating economic consequences of the COVID-19 pandemic.   The defendant's actions in the ADW scheme spanned years.   Rather than turn a new leaf once initially charged in that case, he used the time he had in the community to devise and undertake yet another fraud scheme to steal as much in government funds as possible.   The government respectfully submits that a sentence of 78 months of incarceration, three years of supervised release, and restitution and forfeiture as described herein

is an appropriate and fair sentence in light of the offense conduct, the need for specific and general

deterrence, and the history and characteristics of the defendant.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar. No. 481052

By:     /s/ *Christine M. Macey*
CHRISTINE M. MACEY
D.C. Bar No. 1010730
Assistant United States Attorney
Fraud, Public Corruption, and Civil Rights
Section
601 D Street, NW, Room 5.1519
Washington, DC 20530
(202) 252-7058
Christine.Macey@usdoj.gov